# EXHIBIT 1

1

**Bruce A. Jacobs, Ph.D.**

---

*Crime and Justice Studies*

600 Williams Dr.
Allen, TX 75013
(972) 883-4557
bruceajacobs@gmail.com

April 8, 2021

Sterling Kidd, Esq.
Baker Donelson
One Eastover Center
100 Vision Drive
Suite 400
Jackson, MS 39211

Dear Mr. Kidd:

Below is my report in the *Ruff* matter.

1. My name is Bruce A. Jacobs. I am a Tenured Full Professor of Criminology at the University of Texas at Dallas. I hold a Doctorate of Philosophy Degree in Sociology, with a specialization in Criminology, from the University of Southern California (USC). I hold a Bachelor of Arts Degree in History from Duke University (*Magna Cum Laude, Phi Beta Kappa*).

2. I have over 25 years of experience as a professional criminologist. My scientific research focuses on serious criminality, predatory violence, and illegal drug distribution. I have published three books and numerous double-blind, peer-reviewed articles relevant to these lines of inquiry, most of which are first- or single-authored and most of which appear in the discipline's leading outlets.

3. I have analyzed thousands of crimes of nearly all types at premises around the country, ranging from apartment complexes and malls to restaurants, convenience stores, banks, and bars. I have reviewed hundreds of published studies on offender decision-making, deterrence, policing, crime prevention, and crime causation. I, myself, have conducted two to three hundred interviews with serious offenders (including violent ones), on the streets, in prisons, or in natural settings.

4. During the course of my street-based research, I have conducted extensive field work with police officers in multiple jurisdictions. I have accompanied law enforcement personnel on saturation patrols, gun interdiction, drug busts, gang member field interrogations, search warrants, consent to searches, and undercover buys.

5. In furtherance of my field-based research, and in association with other professional criminologists, I have applied for and received numerous grants funded competitively by both internal and external agencies across the country. These agencies include, but are not limited to, the National Science Foundation (through the National Consortium on Violence Research) the National Institute of Justice, the Harry Frank Guggenheim Foundation, and the Office of the Governor of the State of Texas. I currently serve as a peer reviewer for grant proposals submitted to the National Science Foundation.

6. I have conducted hundreds of security assessments and/or surveys of crime prevention measures at properties across the country, ranging from apartment complexes and malls to convenience stores, car washes, and hotels. These surveys address everything from natural surveillance and sight lines to access control and guard duties and deployment.

7. I have engaged in professional outreach with numerous businesses and/or private individuals on issues of crime analysis, security, guard duties and deployment, crime prevention "posturing," and/or crime deterrence. Such entities include a supermarket conglomerate reporting over $2 billion in annual revenues, a hotel chain reporting assets of over $1 billion, a Fortune 1000 fast food restaurant corporation that recently posted $1.5 billion in annual revenue, and two private sector property management and development companies that oversee more than 40,000 apartment units in at least 20 states. I catalogued specific techniques for establishing an adequate crime prevention posture as well as the scientific/empirical basis for those techniques. This outreach is based on the same methodology I applied in the present case.

8. I served a multi-year term as Chair of my University's Safety and Security Council. That Council was originally tasked by the President of the University (before my chairmanship) with developing, implementing, and evaluating a comprehensive safety and security plan for a campus that now boasts over 20,000 students and 20 million square feet of property. The campus includes 2,000 on-site apartment units that are directly encompassed by the plan. These apartments consume multiple acres and buildings and include amenities such as parking lots, study centers, meeting rooms, lounges, sand volleyball courts, swimming pools, outdoor basketball courts, tennis courts, picnic areas, and mailbox stations. The campus also includes a cadre of both sworn peace officers and non-commissioned security personnel who patrol the campus in various capacities. Such personnel are subsumed directly or indirectly by the plan.

9. I have taught well over 1,500 criminology students in my career, including police officers and security guards, about crime causation and crime prevention.

10. I have developed and taught a number of courses at both the undergraduate and PhD-level relevant to the etiology and control of criminal behavior. These courses include

Advances in Criminological Theory (a PhD-level course), Etiology of Crime and Criminality (a PhD-level course), Violent Crime (both the undergraduate and PhD versions), Qualitative Criminology (a PhD-level course), Drugs and Crime (both the undergraduate and PhD versions), Advanced Criminology, Varieties of Criminal Behavior, Victimless Crime, and Social Control and Criminal Sanctioning.

11. I have been asked and did serve as Division Chair on Robbery for the American Society of Criminology's Annual Meeting. I have provided, and will continue selectively to provide, Continuing Legal Education seminars to both plaintiff and defense counsel across the country on the topics of crime foreseeability, security adequacy, and offender deterrability.

12. I am a peer reviewer for *Criminology*— widely regarded as the #1 criminological journal in the world and the flagship periodical of the American Society of Criminology. I also am a peer reviewer for the *Journal of Research in Crime and Delinquency* and *Justice Quarterly*—widely regarded as the #2 and #3 ranked journals in criminology, respectively, in the world. *Justice Quarterly* is the flagship periodical of the Academy of Criminal Justice Sciences.

13. I continue to serve as peer reviewer for criminological research submitted to the following scientific journals: *Criminology and Criminal Justice, Police Quarterly, Journal of Quantitative Criminology, Deviant Behavior, Social Problems, British Journal of Sociology, The Sociological Quarterly, Journal of Drug Issues, Journal of Contemporary Ethnography, Urban Affairs Review*, and *International Journal of Police Management*. I also continue to serve as a peer reviewer for submissions to select book publishers in my field.

14. I have testified or been retained as a criminologist and/or security expert witness in more than 30 states at both the state and federal level. My methodology has passed *Daubert* motions in both state and federal court. I have never been disqualified as an expert by any court. A true and correct copy of my curriculum vitae, with fee schedule, is attached to this report.

15. I have been asked by Counsel for the Waffle House on Gloster Street in Tupelo, MS to review materials and to render professional opinions regarding the June 2017 shooting of Plaintiff's decedent (Smith).

16. Smith was shot in the parking lot by Nicholas Pack after Pack migrated to the Waffle House from an adjacent property. Pack walked up to Smith and shot him (eyewitness statement of Precious Berry, Tupelo Police Report 2017-5178). The shooting was targeted. Smith and/or members of his party had an altercation with Pack and/or his party some months prior. The Waffle House shooting was an outgrowth of this prior incident (sworn testimony of Detective Scott Floyd, Proceedings of the State of Mississippi v. Nicholas Pack, pages 19-20). The prior shooting did not occur at Waffle House, had nothing to do with Waffle House, nor is there any evidence that Waffle House knew anything about it.

17. The materials that informed this report include the following (file names provided by Counsel, where relevant):

4812-0362-5901 v.1 Tupelo PD.pdf
4813-9697-0397 v.1 Pack Order Reducing Charge.pdf
4814-2205-0771 v.1 (022b) Lee County Communications Center Response to Subpoena.pdf
4815-3542-8309 v.2 (024a) Christy Ruff's Responses to WH's First Interrogatories and Requests for Production.pdf
4817-9962-3581 v.1 Pack Sentencing Order.pdf
4825-8815-2733 v.1 Pack Transcript.pdf
4830-2640-2512 v.1 (021a) WH's Initial Disclosures (WH-Ruff 000-0002).pdf
4843-3040-7635 v.1 (022a) Lee County Sheriff's Department Response to Subpoena (copy).pdf
4852-0646-3389 v.1 2019-06-27 Complaint.pdf
Cam06[02_20_00-02_35_01].avi
Photos.pdf
Telephonic interview with J. Fervier

18. The methods I used to review and assess the above materials involve crime pattern analysis, content analysis, triangulation, and analytic induction.

19. Crime Pattern Analysis is defined by the United States Department of Justice as the "assessment of the nature, extent, and changes of crime [in a given area] based on the characteristics of the criminal incident, including modus operandi, temporal, and geographic variables."[1] Embedded in crime pattern analysis are sub-techniques such as constant comparison, domain analysis, data sorting, and thematic coding. These methods are peer-reviewed, reliable, and reproducible.[2]

20. Content analysis is a widely-used, reliable, and reproducible technique in the social sciences. It involves "a careful, detailed, systematic examination and interpretation of a particular body of material in an effort to identify patterns, themes, biases, and meanings."[3]

21. Analytic induction "is the process by which answers to research questions [or in this case, professional opinions] are emergently constructed as more and more data are collected and systematically examined."[4] It is a widely used method in the social sciences. It is reliable and reproducible.[5]

---

[1] See, David L. Carter, Law Enforcement Intelligence," United States Department of Justice, 440, (2009).
[2] See, e.g., Anselm L. Strauss, QUALITATIVE ANALYSIS FOR SOCIAL SCIENTISTS (1987); James P. Spradley, PARTICIPANT OBSERVATION (1980).
[3] Bruce L. Berg & Howard Lune, QUALITATIVE RESEARCH METHODS FOR THE SOCIAL SCIENCES, 349 (8th ed. 2011).
[4] Johnny Saldaña, THINKING QUALITATIVELY 26 (2014).
[5] See, e.g., C. Frankfort-Nachmias & D. Nachmias, RESEARCH METHODS IN THE SOCIAL SCIENCES (5th ed. 1996).

5

22. Triangulation involves the use of multiple data sources to establish "convergent validity" of a phenomenon and/or to verify a conclusion about a fact in issue. Triangulation permits potential testing and/or falsification of a fact or theory in issue—in this case, whether the subject premises provided adequate and reasonable security relative to the risk. Triangulation is a core tenet of the scientific method. Triangulation is a widely used method in the social sciences. It is peer-reviewed and reliable.[6]

23. As stated earlier, the subject incident was a targeted crime. Targeted crimes generally are not foreseeable as to time or place of occurrence, nor are they reasonably preventable by private landholders.

24. That is, targeted crimes carry a risk independent of, and separate from, crime patterns for a given property, meaning that such data generally are unavailing in assessing the applicability of specific security measures to address a specifically targeted risk at that location. Moreover, when crimes are targeted, alleged defects in the landholder's crime prevention posture typically do not cause such offenses to happen. Rather, the cause lies in the victim-offender relationship, which is personal, idiosyncratic, and unpredictable.

25. Plaintiff, through discovery material, suggests that the subject incident was foreseeable because the subject property recorded numerous police calls for service in the years preceding the incident date. These data are inapposite because the subject incident was targeted. Nonetheless, I will analyze the data for purposes of completeness.

26. The unreliability of calls for service an an indicator of actual crime was established in the peer-reviewed criminological literature 20 years ago.[7] That study was published in the flagship periodical of the American Society of Criminology—the most prestigious peer-reviewed criminology outlet in the world.

27. A subsequent report released by the United States Department of Justice corroborates and expands upon the aforementioned study.[8] The USDOJ publication specifically discusses the documented disparity between "calls for service" and the occurrence of actual crimes and the empirical reasons for this disparity. Criminologists the world over rely on the USDOJ and affiliated agencies to analyze, interpret, and assess crime data.

28. Briefly, "calls for service" are neither equivalent to nor representative of actual crimes and are thus unreliable as indicators of crime at a specific location. In my own experience as a professional criminologist, approximately 70% of calls for service do not generate a validated police report. There is a multitude of reasons for this.

---

[6] *See,* Bruce L. Berg & Howard Lune, QUALITATIVE RESEARCH METHODS FOR THE SOCIAL SCIENCES (8th ed. 2011).
[7] See David Klinger and George Bridges, "MEASUREMENT ERROR IN CALLS-FOR-SERVICE AS AN INDICATOR OF CRIME," *Criminology* 35:705-26 (1997).

[8] Rana Sampson, *Misuse and Abuse of 911*, United States Department of Justice, Office of Community Oriented Policing Services, Washington, D.C., 2004.

29. First, people routinely use 911 reporting for illegitimate, inappropriate reasons/purposes. For example, there are those who may, and do, choose to call the police for reasons of personal animus and use the police as a means to harass those with whom they have some type of dispute. Not infrequently, these situations have some type of domestic origin.

30. Second, offenders may call the police and tell them there is a crime at one location in an area to divert the police resources and lessen their chances of being apprehended at a secondary location. The initial call would reflect criminal activity at a specific address that never occurred.

31. Third, callers may intentionally provide inaccurate information. For example, a caller who has been assaulted might exaggerate the nature of the assault and her injuries in an effort to get a faster police response. The call might appear as an "aggravated assault," when it is actually nothing close to that in its nature and extent.

32. Fourth, even with legitimate, well-intentioned use of 911 reporting, there will be inaccuracies in reporting that make "calls for service" unreliable and inappropriate to use as a benchmark for judging the nature and extent of crime at a specific location. Callers may unintentionally provide inaccurate information. For example, a caller whose purse was taken from their unlocked vehicle may call and report that she has been "robbed," when it is, in fact, a larceny. The "call for service" would reflect a robbery, a much more serious crime. This miscategorization leads to "over-reporting."

33. Fifth, activities that are not even crimes will generate a call for police service. For example, an unruly child, a runaway, excessive noise, emergent physical illness, a dog without a leash, a car accident, a lost cat, found property—each of these things may result in a 911 call, even though no crime has occurred. Similarly, what first appears to be a crime may not be. For example, someone may call the police because they have seen someone looking into a car suspiciously. It turns out that when the police arrive, the person looking in the car is the owner who locked his keys inside. The same applies to someone looking into an apartment window suspiciously. When the police arrive and question him, he explains that he is about to move into that unit and wants a closer look at the layout before he moves in his furniture.

34. Sixth, there often is a difference between incident location and reporting address. That is, "calls for service" may include incidents that are reported at one address but occurred at another—resulting in an inaccurate picture of the amount of crime at a specific location. For example, a person may call the police from a "safe place," e.g., a convenience store, while the incident they are calling about may have occurred down the street or somewhere else. The call can look like the actual incident happened at the convenience store, but it did not.

7

35. Seventh, for a single perceived incident for which there is no corresponding evidence of a "crime" actually having occurred, there may be multiple "calls for service," further exaggerating the nature and extent of crime on a property.

36. Because of the unreliability of calls for service for assessing foreseeability, I analyzed actual police reports describing reported crime at the subject property in the three years before the subject shooting. Two to three years is a typical and/or recommended reference period specified in the peer-reviewed criminological literature.[9]

37. The national standard for assessing violent crime by type of occurrence for foreseeability purposes comes from the Uniform Crime Reporting (UCR) system, a system adopted by the FBI, the United States Department of Justice, and nearly 18,000 police departments across the country. Murder, rape, aggravated assault, and robbery (and their various included sub-types) are the four crime-types of inclusion (i.e., Part I Violent Crimes).

38. Domestic/acquaintance/interpersonal offenses are typically not included in the foreseeability analysis. Such incidents carry a risk independent of, and separate from, aggregate crime levels for a given property, meaning that such data generally are unavailing in assessing the applicability of generalized security measures to address crime risk at a specific location. Moreover, domestic/interpersonal incidents generally are not foreseeable to private landholders, and alleged defects in the landholder's crime prevention posture typically do not cause such offenses to happen. Rather, the cause lies in the victim-offender relationship, which is personal, idiosyncratic, and unpredictable.

39. The crime data revealed that,

> Not a single homicide occurred at the property in the 3-year reference period.

> Not a single robbery (armed or strong arm) occurred at the property in that 3-year period.

> Not a single aggravated assault occurred at the property in that 3-year period.

> Not a single rape or sexual assault occurred at the property in that 3-year period.

> Not a single gun assault of any kind occurred at the property in that 3-year period.

> Not a single person was seriously injured in any act of predatory (stranger-on-stranger) violence during that 3-year period.

---

[9] Lawrence W. Sherman, Violent Stranger Crime at a Large Hotel: A Case Study in Risk Assessment Methods," *Security Journal* 1:40-46.

40. These data convincingly reveal that the similarity, recency, and frequency of prior crime did not exist in a form or at a level to make the subject incident foreseeable. In short, there was no atmosphere of violence at the subject location.

41. Despite the fact that there was no atmosphere of violence at the subject property and and that the subject incident was targeted, Waffle House took numerous and substantive measures to create an adequate and reasonable crime prevention posture there. These measures included the following:

• Systematic lighting inside and outside the facility
• Routine lighting maintenance and repair
• No loitering signage
• 8 surveillance cameras inside and outside the store (with signage)
• Interior public view monitor
• CPTED compliant building boasting excellent natural surveillance
• Fully staffed restaurant (6 employees at the time of the incident)
• Security policies and procedures to enhance customer safety
• Training policies to report suspicious persons
• Training policies on conflict de-escalation where appropriate
• Training policies on when to alert management and/or first responders
• Nightly shift huddles to share and convey relevant information among staff
• Robbery training
• Cash management procedures for robbery prevention and mitigation
• Routine management inspection of property
• Periodic police presence encouraged through food and drink discounts
• Periodic crime risk assessment of stores through RiskTrack scoring system
• Internal incident reporting system to inform real-time security assessment of select stores
• Externally driven reporting system to inform policy and procedure changes of select stores
• Periodic target-hardening measures of stores where appropriate

42. The above measures are consistent with practices associated with Crime Prevention Through Environmental Design (CPTED) and Situational Crime Prevention (SCP). CPTED and SCP are peer-reviewed, scientific approaches to crime prevention that subsume principles endorsed and/or recommended by the United States Department of Justice, the National Crime Prevention Council, and police departments around the country.

43. Finally, there is no evidence that Waffle House personnel acted unreasonably on the the night in question, nor is there any evidence that had Waffle House personnel alerted the police prior to the shooting (assuming *arguendo* that was necessary), that they would have been able to arrive prior to the shooting.

44. The time duration between a theoretical call to authorities for a pre-shooting parking lot disturbance and the actual shooting was significantly shorter than the time duration

between the shooting and the arrival of the first police officer post-shooting. In essence, the video evidence shows that there was approximately 90 seconds between a theoretical call time for the disturbance and the shooting. Yet, the first police officer did not arrive on Waffle House property until approximately four (4) minutes after the shooting.

45. Keep in mind that a call prioritization for a shooting would have been much higher than a call prioritization for a simple disturbance call, decreasing the response time for the shooting relative to the disturbance. The response time differential remained.

46. Assuming but not accepting that uniformed security was necessary, present, and deployed on the night in question, criminologists have widely demonstrated in scientific studies that crime and violence occur despite the general presence of police and/or security. This is due to the functional limits of crime prevention (defiance, imprudence, and displacement) and the theoretical reasons behind these limits; criminologists (including me) have studied these limits and the reasons behind them for decades.

47. The existence of these limits (or their sequelae) is based in part on the following authoritative sources, which appear in peer-reviewed outlets in the discipline of Criminology and have been thoroughly vetted through a double-blind review process—the gold standard in social science:

Claire Nee and Tony Ward, "Review of expertise and its general implications for correctional psychology and criminology," *Aggression and Violent Behavior* 20 (2015) 1–9

M. Lyn Exum, *The Application and Robustness of the Rational Choice Perspective in the Study of Intoxicated and Angry Intentions to Aggress*, CRIMINOLOGY, 933–66 (2002);

Bruce A. Jacobs, *Deterrence and Deterrability*, 48 CRIMINOLOGY 417-441 (2010);

Pamela Lattimore & Ann Witte, *Models of Decision Making Under Uncertainty: The Criminal Choice*, 170–85, in THE REASONING CRIMINAL: RATIONAL CHOICE PERSPECTIVES ON OFFENDING, (Derek B. Cornish & Ronald V. Clarke eds., 1986);

W. William Minor, & Joseph Harry, *Deterrent and Experiential Effects in Perceptual Deterrence Research: a Replication and Extension*, 19 J. RES. CRIME & DELINQ. 190–203 (1982);

Daniel S. Nagin & Raymond Paternoster, *Enduring Individual Differences and Rational Choice Theories of Crime*, 27 L. & SOC'Y REV. 467–96 (1993);

Raymond Paternoster & Alex Piquero, *Reconceptualizing Deterrence: An Empirical Test of Personal and Vicarious Experiences*, 32 J. RES. CRIME & DELINQ. 251-286 (1995);

Robert F. Fornango, 2013, *NIBRS Burglary and Auto Theft Co-Occurrence with Index I Violent Crimes*.

10

Welsh, B.C., & Farrington, D.P. (2003). Effects of closed-circuit television on crime. *Annals of the American Academy of Political and Social Science*, 587, 110-135.

Alex R. Piquero, Wesley G. Jennings, and J.C. Barnes, Violence in criminal careers: A review of the literature from a developmental life-course perspective." *Aggression and Violent Behavior*, 17:171-79.

Alex R. Piquero & Greg Pogarsky, *Beyond Stafford & Warr's Reconceptualization of Deterrence: Personal and Vicarious Experiences, Impulsivity, and Offending Behavior*, 39 J. RES. CRIME & DELINQ., 153–86 (2002);

Greg Pogarsky, *Identifying "Deterrable" Offenders: Implications for Research on Deterrence*, 19 JUST. Q., 431–50 (2002);

Greg Pogarsky & Alex R. Piquero, *Can Punishment Encourage Offending? Investigating the "Resetting" Effect*, 40 J. RES. CRIME & DELINQ., 95–120 (2003);

Travis Pratt, Francis T. Cullen, Kristie R. Blevins, Leah E. Daigle & Tamara D. Madensen, *The Empirical Status of Deterrence Theory: A Meta-Analysis*, 367–95, in 15 TAKING STOCK: THE STATUS OF CRIMINOLOGICAL THEORY, ADVANCES IN CRIMINOLOGICAL THEORY (F.T. Cullen, J.P. Wright & K.R. Blevins eds., 2006);

Lawrence W. Sherman, *Defiance, Deterrence and Irrelevance: A Theory of the Criminal Sanction*, 30 J. RES. CRIME & DELINQ. 445–73 (1993);

Cody W. Telep, Renee J. Mitchell and David Weisburd, "How Much Time Should the Police Spend at Crime Hot Spots? Answers from a Police Agency Directed Randomized Field Trial in Sacramento, California," JUSTICE QUARTERLY, 2014, Vol. 31, No. 5, 905–933

Peter B. Wood, *Exploring the Positive Punishment Effect Among Incarcerated Adult Offenders*, 31 AM. J. CRIM. JUST. 8–22 (2007);

Bradley R.E. Wright, Avshalom Caspi, Terri E. Moffitt & Ray Paternoster, *Does the Perceived Risk of Punishment Deter Criminally Prone Individuals? Rational Choice, Self-Control, and Crime*," 41 J. RES. CRIME & DELINQ. 180–213 (2004);

Jean-Louis Van Gelder, Beyond Rational Choice: the Hot/Cool Perspective of Criminal Decision Making, Psychology Crime and Law, 2013.

Frank E. Zimring & Gordon J. Hawkins, DETERRENCE & MARGINAL GROUPS, 5 J. RES. CRIME & DELINQ. 100–14 (1968).

Corey Whichard and Richard B. Felson, Are Suspects Who Resist Arrest Defiant, Desperate, or Disoriented? *Journal of Research in Crime and Delinquency*, 2016

George Kelling, Tony Pate, Duane Dieckman, and Charles Brown. 1974. The Kansas City Preventive Patrol Experiment, Police Foundation.

Koper, C. (1995). Just enough police presence: Reducing crime and disorderly behavior by optimizing patrol time in crime hotspots. *Justice Quarterly*, 12(4): 649-672.

David L. Carter, Law Enforcement Intelligence, United States Department of Justice, 440, (2009).

Frank E. Zimring & Gordon J. Hawkins, DETERRENCE: THE LEGAL THREATS IN CRIME CONTROL, (1973);

Elijah Anderson, *Code of the Street*, 1999, Norton.

Baron, Stephen W. 2013. When formal sanctions encourage violent offending: How violent peers and violent codes undermine deterrence. *Justice Quarterly*, 30:926-955.

Beauregard, Eric, and Martin Bouchard. 2010. Cleaning up your act: Forensic awareness as a detection avoidance strategy. *Journal of Criminal Justice*, 38:1160-1166.

Johnson, Shane D., Rob T. Guerette, and Kate Bowers. 2014. "Crime displacement: what we know, what we don't know, and what it means for crime reduction." *Journal of Experimental Criminology* 10:549-71.

Loughran, Thomas A., Raymond Paternoster, Alex R. Piquero, and Greg Pogarsky. 2011. "On ambiguity in perceptions of risk: Implications for criminal decision making and deterrence. *Criminology*, 1029-1061."

Loughran, Thomas A., Raymond Paternoster, Alex R. Piquero, and Jeffrey Fagan. 2012a. "A good man always knows his limitations: The role of overconfidence in criminal offending." *Journal of Research in Crime and Delinquency*, 50:327-358.

Loughran, Thomas A., Ray Paternoster and Douglas Weiss. (2012c). "Hyperbolic Time Discounting, Time Preferences and Deterrence," *Journal of Quantitative Criminology* 28:607–628.

Loughran, Thomas A., Greg Pogarsky, Alex R. Piquero and Raymond Paternoster. (2012d). "Reassessing the Certainty Effect in Deterrence Theory Using Insight from Prospect Theory," *Justice Quarterly* 29:712-741.

Mamayek, Chae, Thomas Loughran, and Ray Paternoster. 2015. Reason taking the reins from impulsivity: The promise of dual-systems thinking for criminology. *Journal of Contemporary Criminal Justice*, 31: 426-448.

Pogarsky, Greg. 2007. Deterrence and individual differences among convicted offenders. *Journal of Quantitative Criminology*, 23:59-74.

ER Groff, JH Ratcliffe, CP Haberman, ET Sorg, 2015, Does what police do at hot spots matter? The Philadelphia policing tactics experiment. *Criminology*, 53:23-53.

R Rosenfeld, MJ Deckard, E Blackburn, 2014, The effects of directed patrol and self-initiated enforcement on firearm violence: A randomized controlled study of hot spot policing. *Criminology*, 52:428-449.

...

R Rosenfeld, MJ Deckard, E Blackburn, 2014, The effects of directed patrol and self-initiated enforcement on firearm violence: A randomized controlled study of hot spot policing. *Criminology*, 52:428-449.

Bruce Taylor, Christopher S. Koper, Daniel J. Woods, 2011, A randomized controlled trial of different policing strategies at hot spots of violent crime. *Journal of Experimental Criminology*, 7:149–181.

Kim Lersch and Timothy C. Hart, *Space, Time, and Crime*, Carolina Academic Press, 2011.

48. Reviewing these studies, their methodology, and their findings will assist the trier of fact in determining whether the crime prevention posture in place at the subject property was adequate and reasonable relative to the risk of this incident.

49. In summarizing this report, not a single act of predatory violence reportedly occurred at the Waffle House in the three (3) years preceding the incident. The subject shooting was not linked to any atmosphere of violence at Waffle House, nor did Waffle House impel the shooter's conduct in any way. The subject incident was targeted and grew out of prior conflict between Plaintiff's decedent's party and the shooter's party. There is no evidence that Waffle House knew anything about this prior conflict. There is no evidence that Waffle House knew or should have known, that the subject incident was about to occur. There is no evidence that additional security measures and/or different responses would have prevented the subject incident. The security measures at Waffle House were adequate and reasonable relative to the risk.

50. The opinions set forth in this report are based upon my education, training, experience, and research in sociology and criminology, as well as my review of the documentation in this case and are given to a reasonable degree of scientific probability.

51. As a professional criminologist, I have scientific, technical, and other specialized knowledge that will assist the jury in understanding the evidence in this case or determining a fact in issue.

Respectfully submitted,

Bruce A. Jacobs, PhD